WHITLOW v. MONROE.

1. BANKS AND BANKING—ASSESSMENTS ON STOCK—BURDEN OF PROOF
   —OWNERSHIP—AGENCY.

   In suit by trustees of segregated assets of closed bank to re-
   cover assessment on stock, plaintiffs had the burden of prov-
   ing either that former president was the real owner of all
   shares appearing in his name and that of his brother on
   the books of the bank or that the brother who procured a part
   of the assessment was the authorized agent for a group of
   relatives so as to render all members of group liable for
   balance of assessment on stock held by them.

2. SAME—ASSESSMENT ON STOCK—CORPORATIONS—UNAUTHORIZED
   EXECUTION OF NOTE—INFERENCES.

   It cannot be inferred from proof of the unauthorized execution
   of a note in the name of a defunct corporation that its assess-
   ment on bank stock which it held was to be satisfied in suit
   by trustees of the segregated assets of a closed bank to recover
   balance of stock assessment where other evidence shows that
   no attempt was made to satisfy assessment on stock held by
   the corporation.

3. SAME—ASSESSMENT OF STOCK—PRINCIPAL AND AGENT—EVIDENCE.

   In suit by trustees of the segregated assets of a closed bank to
   recover from certain stockholders of bank as reorganized the
   balance of assessment on their stock in the closed bank,
   plaintiffs' evidence held, insufficient to prove that party who
   acted for the group of relatives was the authorized agent for
   all of them so as to hold them jointly and severally liable for
   amount claimed.

4. SAME—STOCK RECORD—PRESUMPTION AS TO OWNERSHIP—REBUT-
   TAL—EVIDENCE.

   Presumption of ownership arising from bank stock record after
   transfer of stock at request of administrator of estate of
   stockholder in whose deposit box certificate of stock issued
   to his brother was found indorsed in blank, so as to make it
   appear, at time bank was closed, that such stock belonged to

deceased stockholder in whose box certificate was found, *held,* clearly rebutted by evidence of brother as to transfer of such stock for other investments in which deposit box holder had only a part.

5. LIMITATION OF ACTIONS—BANK STOCK ASSESSMENT—COMMENCEMENT OF LIQUIDATION.

Suit to collect assessment levied on bank stock which was brought less than six years from time assessment was made although more than six years from time bank was placed "in process of liquidation" was not barred by the statute of limitations as the liability did not arise until the assessment was made (3 Comp. Laws 1929, §§ 11945, 13976).

Appeal from Van Buren; Pugsley (Earl C.), J., presiding. Submitted October 18, 1940. (Docket No. 128, Calendar No. 41,327.) Decided February 7, 1941. Rehearing denied April 11, 1941.

Bill by Ollie M. Whitlow, Norman Wyers, and Henry S. McGuire, trustees of the segregated assets of the First State Bank of South Haven, Michigan, against Helen S. Monroe, Charles O. Monroe, Lorene S. Monroe, Charles J. Monroe, Randolph B. Monroe, Stephen B. Monroe, Jay R. Monroe, his heirs, representatives and assigns, and C. J. Monroe Sons Real Estate Company, a corporation, to recover an assessment against them as stockholders of the bank. Bill dismissed as to all defendants except C. J. Monroe Sons Real Estate Company. Plaintiffs appeal. Affirmed.

*Diekema, Cross & Ten Cate (Harry C. Howard,* of counsel), for plaintiffs.

*Mason, Sharpe & Stratton,* for all defendants except C. J. Monroe Sons Real Estate Company.

BUSHNELL, J. Plaintiffs, trustees of the segregated assets of the First State Bank of South Haven,

Michigan, brought a bill of complaint to recover an assessment against the stockholders of that bank. They appeal from a decree dismissing the bill as to all defendants except C. J. Monroe Sons Real Estate Company.

This bank was closed under a proclamation of the governor on February 14, 1933, and a conservator was appointed on March 27, 1933. On May 11, 1933, a plan of reorganization of the bank was approved by the State banking commissioner and the governor and a 100 per cent. stock assessment was levied against stockholders on June 2, 1933.

The defendants are identified as follows: Stephen B., George C., now deceased, and Charles O. Monroe, who were brothers, were equally interested in defendant C. J. Monroe Sons Real Estate Company, a corporation. Helen S. Monroe is the widow of George C., and Randolph B. Monroe is their son and the administrator of his father's estate. Charles J. Monroe is the son of Stephen B. Monroe; Lorene S. Monroe is the wife of Charles O. Monroe; and Jay R. Monroe, now deceased, was a cousin of the Monroe brothers. No appearance was entered for the real estate company and a default was taken against it.

Defendants, who may be described as the "Monroe interests," held 340 shares of the stock of the bank, which had a par value of $100 per share. When the reorganized bank opened on June 26, 1933, $53,000 had either been paid or pledged on stock assessments and credited to the capital structure of the reorganized bank, $20,000 of this amount being supplied by the "Monroe interests," largely through the personal effort and guaranty of defendant S. B. Monroe. It is the claim of plaintiffs that the defendants are now liable, either jointly or severally, on the remaining 140 shares of the 340 which originally stood in their names on the books of the bank.

George C. Monroe, who was president of the bank, died on January 8, 1933, prior to the closing of the bank. He left his entire estate to his widow, defendant Helen C. Monroe. At the time of the death of George C. Monroe the bank records showed that the "Monroe interests" held bank shares as follows: George C. Monroe, 65 shares; S. B. Monroe, 80 shares; Charles O. Monroe, 20 shares; Lorene S. Monroe, 10 shares; Randolph B. Monroe, 10 shares; J. R. Monroe, 10 shares; Charles J. Monroe, 10 shares; and the C. J. Monroe Sons Real Estate Company, 135 shares.

After the death of George, his son, Randolph, found certificates for 65 shares in his father's safety deposit box along with other papers. These certificates had been indorsed in blank by George. Also in this box were 80 shares of stock issued to S. B. Monroe and indorsed in blank by him. With these certificates was a holographic will of George C. Monroe which designated Randolph as beneficiary. Believing that he had become the owner of the bank stock under the holographic will, Randolph surrendered the 145 shares to the bank and obtained new certificates therefor in his own name. When he learned that the holographic will was invalid, but still believing that the entire 145 shares had belonged to his father at the time of his death, Randolph, on January 27, 1933, surrendered the certificates which had been issued in his own name and obtained new certificates therefor in the name of his deceased father, George C. Monroe. Because of these transfers, when the bank closed on February 14, 1933, its books did not show any stock in the name of S. B. Monroe and 145 shares in the name of George, the other Monroe holdings remaining the same. The estate of George has since been probated, and its assets have been assigned to his widow, Helen.

S. B. Monroe testified that he traded his 80 shares for 2,052 shares of Kalamazoo Bancshares, Inc., stock as follows: from Charles O. Monroe, 272 shares; C. J. Monroe Sons Real Estate Co., 1,426 shares; George C. Monroe, 313 shares; and Charles S. Monroe, 41 shares.

As a result of the efforts of the conservator to secure capital for the reorganized bank through stock assessments, S. B. Monroe wrote a letter to his son, Charles J. Monroe, under date of May 11, 1933, in which he discussed the possibility of providing funds for the reorganization of the bank and stated that he was "disposed to undertake to assure subscriptions to 200 shares." In this letter he claimed that the transfer of 80 shares from himself to George was by reason of a bona fide sale in February of 1932. After S. B. Monroe made the assurance of $20,000, he instructed his nephew, Randolph, to give a note for this amount and left him to arrange the details. In the meantime, Jay R. Monroe had paid $1,000 in cash to cover the assessment on his 10 shares. Randolph, instead of giving his own note for $19,000, gave one signed by C. J. Monroe Sons Real Estate Company. Renewals of this note were made from time to time and eventually the entire $20,000 was paid in full, S. B. Monroe personally paying $12,000.

At the time the real estate company note was given, S. B. Monroe was in New York, and there is no question but that the officers of the company never authorized its execution, nor did that company pay directly or indirectly any part thereof. It is admitted by the conservator that the status of the real estate company was discussed in the negotiations between himself and S. B. Monroe. This company was insolvent at the time of these negotiations and its charter expired in 1934, five years before the instant action was commenced.

Plaintiffs advance two theories under which they claim to be entitled to recover: First, that either 140 or 145 shares of the bank stock passed to the widow, Helen; that these are the shares upon which the assessment was left unpaid; and, therefore, a decree for the assessment should be rendered against her and she should be declared a trustee of the property of the estate to the extent of this assessment. Plaintiffs' other theory is that Stephen B. Monroe acted as agent for all the "Monroe interests" and that the various defendants, by their conduct, accepted and ratified this agency; that Stephen as their agent agreed to take care of the assessment on the entire 340 shares of bank stock which included those owned by the real estate company; that in carrying out this agreement, Stephen only took care of the assessment on 200 shares, leaving the balance unpaid and, therefore, defendants are jointly and severally indebted in the sum of $14,000. Plaintiffs say in their brief that the real issue involved is: "Where rests the liability for the payment of the assessment on 140 shares of stock held by the "Monroe interests," which has not been paid?"

The burden rested upon plaintiffs to prove either that George C. Monroe was the owner of 145 shares or that Stephen was the authorized agent of all the defendants. To this end, plaintiffs sought to show that the $20,000 paid into the reorganized bank covered the 135 shares owned by the real estate company, because its note was used in the transaction, with only the balance of $6,500 being applicable to shares held personally by the other defendants. In view of the testimony of the conservator and Stephen B. Monroe that the defunct condition of the real estate company was discussed and understood during the negotiations leading up to the assurance and the testimony to the effect that the assurance was

limited to cover assessments on stock held personally by individual Monroes, it must be concluded that there was no attempt to satisfy the assessment on the stock held by the real estate company. It can not be inferred from proof of the unauthorized execution of a note in the name of the defunct corporation that its assessment was to be satisfied. Neither did plaintiffs prove that Stephen was the authorized agent of all the defendants.

The situation presented is essentially one of fact, passed upon adversely to plaintiffs by the trial judge. An examination of the testimony does not disclose any compelling reason for disagreement with the conclusion reached by the trial court that George C. Monroe, at the time of his death, was the owner of only 77-1/5 shares (made up of his own 65 and his proportion of the Kalamazoo Bancshares trade with S. B. Monroe) and not 145 as shown by records of the bank at the time of its closing. Under the circumstances of this case, plaintiffs cannot rely upon the presumption of ownership based upon the stock record. Cf. *May* v. *McQuillan,* 129 Mich. 392; *In re Smith's Estate,* 282 Mich. 566; and *Glass* v. *Lock,* 286 Mich. 628. The appearance of George C.'s name as record owner of 145 shares at the date the bank closed was due to an unauthorized transfer made subsequent to his death. This transfer was made by the bank at the request of Randolph B. Monroe who proceeded first under the impression that this stock belonged to himself and later that this stock belonged to his father. The facts of this case rebut any presumption that may arise from record ownership, and plaintiffs' proof fell short of showing ownership in George C. Monroe of any more than 77-1/5 shares.

The briefs filed on appeal also discuss the question of the statute of limitations. (3 Comp. Laws 1929, § 13976 [Stat. Ann. § 27.605].) The date of the as-

sessment was June 2, 1933, and suit was begun on May 18, 1939. Defendants base this defense upon the following language contained in the statute imposing liability upon stockholders for assessments (3 Comp. Laws 1929, § 11945 [Stat. Ann. § 23.52]):

"Such liability may be enforced in a suit at law or in equity by any such bank in process of liquidation, or by any receiver, or other officer succeeding to the legal rights of said bank."

Defendants claim that under this section the liability for the assessment accrued at the time the bank was placed "in process of liquidation;" that the bank was "in process of liquidation" prior to May 18, 1933; and, therefore, the claim is barred by the statute of limitations.

This defense has heretofore been decided adversely to defendants' contention in a number of decisions of this court. *Lawrence* v. *DeBoer,* 273 Mich. 172; *In re Graham's Estate,* 276 Mich. 321; *McCaslin* v. *Albertson,* 279 Mich. 650; and *Glass* v. *MacNaughton,* 291 Mich. 363. In *Re Graham's Estate, supra,* we said, citing *Lawrence* v. *DeBoer, supra:* "The liability did not arise until the assessment was levied." In *Glass* v. *MacNaughton, supra,* p. 374, the Court said:

"Plaintiff's cause of action dates from the date of the assessment, November 15, 1933. *Nichol* v. *Newman,* 160 Mich. 582; *Peake* v. *Fuller,* 123 Mich. 684."

Since the assessment in the instant case was not levied until June 2, 1933, plaintiffs' action was not barred on May 18, 1939.

The decree of the trial court is affirmed, with costs to appellees.

SHARPE, C. J., and BOYLES, CHANDLER, NORTH, McALLISTER, WIEST, and BUTZEL, JJ., concurred.